**653**

ADAMS et al. v. OSAGE TRIBE OF INDIANS
et al.

ADAMS et al. v. UNITED STATES et al.

MULLENDORE et al. v. OSAGE TRIBE OF
INDIANS et al.

YARBROUGH et al. v. OSAGE TRIBE OF IN-
DIANS et al.

Nos. 573, 635–637.

Circuit Court of Appeals, Tenth Circuit.
June 27, 1932.

F. E. Riddle, of Tulsa, Okl. and M. L. Holcombe, of Pawhuska, Okl. (Holcombe, Lohman & Barney, of Pawhuska, Okl., on the brief), for appellants.

Jno. M. Goldesberry, U. S. Dist. Atty., of Tulsa, Okl., T. J. Leahy, of Pawhuska, Okl. (A. E. Williams, Asst. U. S. Dist. Atty., of Tulsa, Okl., L. N. Stivers, Osage Tribal Atty., C. S. Macdonald, and F. W. Files, all of Pawhuska, Okl., and F. M. Goodwin, of Washington, D. C., on the brief), for the United States et al.

W. P. McGinnis, of Bartlesville, Okl., and J. H. Maxey, of Tulsa, Okl. (Fred M. Carter, of Bartlesville, Okl., J. H. Hill and John R. Ramsey, both of Tulsa, Okl., W. H. Francis, of Dallas, Tex., B. B. Blakeney, of Oklahoma City, Okl., B. W. Griffith and Sol H. Kauffman, both of Tulsa, Okl., Hayes McCoy and Warren T. Spies, both of Bartlesville, Okl., and Alvin Richards, Floyd A. Calvert, Edward H. Chandler, Summers Hardy, and Wm. O. Beall, all of Tulsa, Okl., on the brief), for appellees oil companies.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

LEWIS, Circuit Judge.

Three of these suits (Nos. 573, 636, and 637) were brought by individual owners of Osage surplus allotments selected pursuant to the provisions of the Act of June 28, 1906 (34 Stat. 539). They are class suits and purport to speak for original allottees and their grantees, and assert ownership in themselves severally to the oil, gas, coal, and other minerals under their allotments on and after April 8, 1931. Hence they pray that their titles to the minerals underlying their land be quieted and all adverse claims thereto made of record or otherwise be removed by decree. The defendants in each suit are the Osage Tribe, its chief, assistant-chief, its secretary, the Osage Tribal Council, the Secretary of the Interior, the Commissioner of Indian Affairs, the Superintendent of the Osage Indian Agency, and named oil companies that have leases on some of the allotments given to them by the Osage Tribe with the approval of the Secretary of the Interior.

The fourth suit, No. 635, was brought by the United States, after two of the suits before referred to were instituted, against the plaintiffs in those suits and a large number of other named persons who owned or claimed to own allotments and by virtue thereof were asserting ownership of all minerals under their allotments. Some of them are the **original** Indian allottees, others their heirs,

and others their grantees—some of the grantees are not members of the tribe and are without Indian blood. The United States alleges that these claims of ownership of minerals are without right and an interference with its title and functions as trustee for the tribe in the matter of leasing Osage mineral lands and in the production and use of oil and gas therefrom as provided by said act, are an obstruction to lessees in operating their leases and disposing of the mineral produced, and a cloud on the leasehold estates, a cloud upon the title of the United States as trustee for said tribe and upon the rights and interests of the tribe in the minerals. The United States alleges that it is the owner of all of said minerals holding them in trust for the use and benefit of the Osage Tribe, having acquired the same by deed from the Cherokee Nation pursuant to certain acts of Congress. It relies on certain sections of said Act of June 28, 1906, and amendments thereto, under which it claims it still holds title to said minerals as trustee. It alleges that defendants and many others in like situation have claimed and are now claiming to be the owners of all of the minerals under their several allotments, and it prays that its title be adjudged and said adverse claims removed as clouds thereon and the rights of said tribe and said lessees be also confirmed and quieted.

The defendants in suit No. 635 filed crossbills alleging their said claims of ownership and title to the minerals under their respective allotments. Motions to dismiss the bills in the three suits first referred to and the cross-bills in the suit brought by the United States were sustained. The bills in the three suits were dismissed, and in the one brought by the United States decree was entered adjudging the minerals to be the property of the Osage Tribe, title to which is held in trust by the United States for the tribe's use and benefit. These appeals were then taken.

■ Before coming to a consideration of the arguments advanced to sustain the claims of appellants that on and after April 8, 1931, the allottees, or their heirs or assigns, were and now are respectively the owners of the minerals in and under their several allotments which cannot be taken from them by Congress, we set forth the parts of the Act of June 28, 1906, necessary for consideration. It is known as the Osage Allotment Act. At that time the United States held title to all of the Osage Indian Reservation in trust for that tribe. The act manifests the purpose of Congress to divide the tribe's communal estate equally in severalty among

its members with certain restrictions and reservations. Counsel for appellants tell us this act was prepared by officials and representatives of the tribe and was passed in the form we now find it with but slight and immaterial changes. It is an established rule that treaties and legislative acts that deal with Indians and their affairs are to be taken in accord with the common understanding, not in their technical sense, but in the sense that an illiterate people would understand them. The act is entitled: "An Act For the division of the lands and funds of the Osage Indians in Oklahoma Territory, and for other purposes."

The concluding sentence of section 1 is this:

"* * * And the tribal lands and tribal funds of said tribe shall be equally divided among the members of said tribe as hereinafter provided."

The first sentence of section 2 is this:

"That all lands belonging to the Osage tribe of Indians in Oklahoma Territory, except as herein provided, shall be divided among the members of said tribe, giving to each his or her fair share thereof in acres, as follows. * * *"

The seventh paragraph to said section 2, after providing for the issuance to adult members of the tribe by the Secretary of the Interior of certificates of competency which gives to the Indian receiving such certificate authority to dispose of his surplus allotments, closes with two provisos, thus:

"And provided further, That nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided: And provided further, That the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said twenty-five years, unless otherwise provided for by Act of Congress."

A part of section 3 reads thus:

"That the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six; and leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its

tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe. * * * ”

By the Act of March 3, 1921 (41 Stat. 1249), Congress extended the reservation period of the minerals made in the proviso to said seventh paragraph to section 2 "for the period ending April 7, 1946;" and by the Act of March 2, 1929 (45 Stat. 1478), a further extension was made "until the eighth day of April, 1958, unless otherwise provided by Act of Congress. * * * ”

The deeds conveying allotments to allottees contain this:

"Subject, however, to all the conditions, limitations and provisions of the Act of Congress of March 3, 1909 (35 Stat. L. 778), and the Act of June 28, 1906 (34 Stat. L. 539), one of which is that the oil, gas, coal, and other minerals covered by the lands hereby conveyed are reserved to the Osage Tribe for a period of twenty-five years from the eighth day of April, 1906. * * * ”

Obviously appellants' claims to ownership of the minerals are dependent in large part, if not wholly, on the meaning and effect to be given to the last two provisos in paragraph seventh of section 2 and the quoted part of section 3 of the Act of June 28, 1906. The diction used is simple and plain, and its meaning clear to common understanding. The minerals were not to be sold, they were reserved to the tribe for twenty-five years, leases for all mineral to be made through its tribal council with the Secretary's approval, and the royalties on minerals produced paid to the tribe, and the minerals in the allotted lands were to become the property of the individual owners of the lands from and after April 8, 1931, unless otherwise provided by act of Congress. But appellants say these legislative provisions for administration of the trust estate cannot be given their obviously intended effect, that the act did not divide the land into two estates—(a) surface and (b) mineral, and then provide for deeds to allottees conveying only the surface; that a mineral estate was not reserved in the tribe or the United States by the first proviso, but only a use of the minerals (but see said section 3 and deeds to allottees), and that for a limited time which has expired; that the word "reserved" used in the act and particularly in allotment deeds withheld nothing from the grants, the word necessary for that purpose being "excepted"; and therefrom it is argued the allottees took titles in fee simple, or if not, titles to the

minerals as vested remainders, and the two acts extending the reservation of the minerals first to April 7th, 1946, and thereafter to April 8, 1958, are confiscatory and void under the Fifth Amendment, U. S. Constitution.

The position and contentions of appellants' counsel are stated thus in their brief in appeal case No. 573:

"We want it understood here and now and for all time, that if the surface of the land only was allotted and not the title in fee; if the title to the oil and gas was excepted from the grant and conveyance and retained in the tribe, which undoubtedly was well within the power of Congress to have done in constructing and passing the Allotment Act, then we concede we have no lawsuit; we had no rights in the minerals which could be protected by the Fifth Amendment; we had no such rights as to preclude Congress from dealing with the subject and doing with it whatsoever its judgment might dictate."

Again they say:

"The paramount issue for determination is as to whether or not under the allotment act and the deeds of conveyance executed pursuant thereto there was conveyed a present vested title in remainder to the oil and gas, which right and title is protected from transfer or being divested by the amendment or the attempted confiscation act of Congress of March 3, 1921."

Giving attention now to the proposition relied on by appellants, we do not doubt that the rights of litigants involving a grant are dependent under given conditions on whether the word "except" or "reserve" be used in the instrument of conveyance. The former is appropriate when some part or parcel of the thing granted is withdrawn from the operation of the conveyance, and the latter is the creation in the grantor of some new right issuing out of the thing granted, which did not previously exist as an independent right. But the terms frequently have been held to be synonymous, "reserve" being taken as "except" is taken under conditions like these in deeds to carry out the intentions of the contracting parties, as will appear from adjudications hereinafter to be cited. We do not mean to say that the principle under consideration applies to statutes as it does to conveyances in which the parties interested deal at arms' length. Again, it is vigorously asserted that there is no division of the allotments into two estates—surface and mineral. We do not understand that an owner in fee need

do more than convey the minerals to effect a division. Thornton's Law of Oil and Gas (4th Ed.) vol. 1, § 342, says:

"A reservation or exception of all the minerals in a tract conveyed is a separation of the estate in the minerals from the estate in the surface."

Tiffany on Real Property, p. 875, says:

"In construing conveyances thus creating, or attempting to create, rights in the land granted in favor of the grantor, the courts ignore the terms used, such as 'except' and 'reserve', and construe the language as an exception or a reservation, according to the nature of the rights sought to be created."

The Circuit Justice in Bowman v. Wathen, 2 McLean, 376, Fed. Cas. No. 1,740, said:

"The words exception and reservation are used synonymously in grants, and have the same effect. The effect of the deed does not depend upon the use of the one or the other of these terms, but on the facts which they represent."

In Wardell v. Watson, 93 Mo. 107, 5 S. W. 605, 606, the controversy was between a surface owner and one claiming the underlying coal. The court said:

"Coal, under the surface of the land, is the subject of a grant or of a reservation. * * * A reservation of minerals and of mining rights, it is said, is construed as an actual grant thereof; and, though a reservation is to be construed most strongly against the grantor, still there will be retained in him all that it was the clear meaning of the parties to reserve from the conveyance. Marvin v. Mining Co., 55 N. Y. 538 [14 Am. Rep. 322]. Whether the separate estate, consisting of the coal, was first created by a grant, or by a reservation is immaterial."

In Whitaker v. Brown, 46 Pa. 197, it was held that "reserving" should be given the meaning given to "excepting," and it was noted that as early as Coke on Littleton it was said that "reserving" sometimes hath the force of saving or excepting. See, also, Stockwell v. Couillard, 129 Mass. 231; Bodcaw Lbr. Co. v. Goode, 160 Ark. 48, 254 S. W. 345, 29 A. L. R. 578; Smith v. Furbish, 68 N. H. 123, 44 A. 398, 47 L. R. A. 226; Preston v. White, 57 W. Va. 278, 50 S. E. 236; Standard Elkhorn Coal Co. v. Bolen, 193 Ky. 342, 236 S. W. 241; Haldiman v. Overton, 95 Vt. 478, 115 A. 699; Town of Farmington v. Riley, 88 Conn. 51, 89 A. 900, 901; Martin v. Cook, 102 Mich. 267, 60 N. W. 679; Marion County Lbr. Co. v. Hodges, 96 S. C. 140, 79 S. E. 1096; Sloan v. Lawrence Furnace Co., 29 Ohio St. 568; Baker v. McDowell, 3 Watts & S. 358; Shoenberger v. Lyon, 7 Watts & S. 184; Snoddy v. Bolen, 122 Mo. 479, 24 S. W. 142, 25 S. W. 932, 24 L. R. A. 507; States Oil Corp. v. Ward (Tex. Com. App.) 236 S. W. 446. This court said in Taylor v. Tayrien, 51 F.(2d) 884, 887: "The 1906 act made no allotment of the mineral estate in the land; it remained tribal property." The claim that allottees took vested estates in remainder on the issuance of deeds to their allotments is clearly without merit.

"A remainder is the remnant of an estate in land, depending upon a particular prior estate created at the same time and by the same instrument and limited to arise immediately on the determination of that estate and not in abridgment of it." 10 Ency. U. S. Sup. Ct. Rep., p. 644; 4 Kent's Com. vol. IV, p. 196.

Example, grant to A. for life or years, remainder to B. in fee. The grant is of one and the same res, and the particular prior estate therein that supports the remainder determines on the right of the remainderman to be let in.

But the discussion so far has been largely directed to propositions advanced by appellants' counsel. In so doing we think the issues of law that control have been too narrowly restricted. The Congress had full power, when it passed the Allotment Act, to make such provisions for safeguarding and administering the communal estate of the tribe, and dividing it in severalty among the members of the tribe, as its informed judgment might dictate, for the benefit of all concerned—whether it would be equitable and just that all tribal property, including minerals under the land, be at once allotted among the members in severalty. There must have been a doubt, well founded in later developments, that the minerals, since proven to be of great wealth, could not then be equitably divided, and so Congress chose a method by which that could be and is being accomplished. For that purpose the act provided that minerals under lands to be allotted were reserved to the Osage Tribe and were not to be sold. The necessary effect of this was to withhold the minerals from division, and set them apart from the lands to be divided, for the use and benefit of the tribe, not disturbing the tribe's communal equitable estate in them. It further provided that the minerals should become the property of the individual owners of the allotted lands at the expiration of twenty-

five years from and after April 8, 1906, unless otherwise provided for by act of Congress, and during those twenty-five years, while the minerals remained communal property, the two acts against which attack is here made extended the reservation of the minerals in the tribe "until the eighth day of April, 1958, unless otherwise provided by Act of Congress. ' ' " The purpose of Congress as disclosed in the Allotment Act and the extension acts is plain. The contention of appellants is without merit. And so we say the reservation in the Allotment Act and the Acts of March 3, 1921, and March 2, 1929, were "but an exertion of the administrative control of the government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect and while the tribal relations continued." Gritts v. Fisher, 224 U. S. 640, 648, 32 S. Ct. 580, 583, 56 L. Ed. 928.

Decrees affirmed.