The **NORTHERN CHEYENNE TRIBE**,
Plaintiff,

v.

William **HOLLOWBREAST** et al.,
Defendants.

Civ. No. 883.

United States District Court,
D. Montana,
Billings Division.

Sept. 29, 1972.

Rehearing Denied Nov. 28, 1972.

Longan & Holmstrom and Richard F. Cebull, Billings, Mont., and Bert W. Kronmiller, Hardin, Mont., for plaintiff.

Otis L. Packwood, U. S. Atty., Billings, Mont., for Myron L. Littlebird.

Montana Legal Services Association and Thomas J. Lynaugh, Hardin, Mont., for Elva L. Littlechief Williamson and James Bowen.

Lewis E. Brueggemann and Marion B. Porter, Billings, Mont., for William Hollowbreast and others.

## ORDER AND OPINION

JAMESON, District Judge.

This is a class action brought pursuant to Public Law 90–424, approved July 24, 1968 (82 Stat. 424), which amended Section 3 of the Act of June 3, 1926 (44 Stat. 690), as amended by the Acts of July 24, 1947 (61 Stat. 418) and September 22, 1961 (75 Stat. 586), to reserve in perpetuity the minerals underlying the Northern Cheyenne reservation for the benefit of the plaintiff Tribe.

Under prior acts the minerals would have become the property of the allottees, their heirs and devisees, in 1976, Section 3 of the Act of June 3, 1926 providing:

"Sec. 3. That the timber, coal or other minerals, including oil, gas, and other natural deposits, on said reservation are hereby reserved for the benefit of the tribe and may be leased with the consent of the Indian council under such rules and regulations as the Secretary of the Interior may prescribe: *Provided,* That at the expiration of fifty years from the date of the approval of this Act the coal or other minerals, including oil, gas, and other natural deposits, of said allotments shall become the property of the respective allottees or their heirs: *Provided further,* That the unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians." 44 Stat. 690, 691.

Public Law 90–424 amends Section 3 of the Act of June 3, 1926, as amended, to read:

"Sec. 3. (a) The coal or other minerals, including oil, gas, and other natural deposits, on said reservation are hereby reserved in perpetuity for the benefit of the tribe and may be leased with the consent of the Indian council for mining purposes, in accordance with the provisions of the Act of May 11, 1938 (52 Stat. 347; 25 U.S.C. 396a–f), under such rules, regulations, and conditions as the Secretary of the Interior may prescribe.

"(b) The unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians." 82 Stat. 424, 425.

The Northern Cheyenne Tribe was authorized by Section 2 of Public Law 90–424 to commence this action "against the allottees who received allotments pursuant to the Act of June 3, 1926, as amended, their heirs or devisees, either individually or as a class, to determine whether under the provisions of the Act of June 3, 1926, as amended, the allottees, their heirs or devisees, have received a vested property right in the minerals which is protected by the fifth amendment." [1]

---

1. This section provided further that the United States District Court for the District of Montana shall have jurisdiction to hear and determine the action, with

Pursuant to this Act and Rule 23, F. R.Civ.P.[2] the Northern Cheyenne Tribe[3] commenced this action on July 2, 1970, within two years of the effective date of the Act, against ten named defendants,[4] individually and as representatives of all allottees, their heirs or devisees who received allotments pursuant to the Act of June 3, 1926, as amended,[5] seeking judgment that the allottees do not have a vested right in the minerals underlying the reservation and that the minerals are reserved in perpetuity for the benefit of the Tribe.

Ten of the named defendants are members of the plaintiff Tribe[6] and are represented by Messrs. Brueggemann and Porter, who also represent nine additional defendants who are members of the Tribe. Another member of the Tribe who was not a named defendant is represented by the United States Attorney for the District of Montana. Two of the named defendants are not members of the Tribe. One of these defendants, Elva L. Littlechief Williamson, is represented by the Montana Legal Services and its Big Horn and Rosebud County branch, who also represent James Bowen.[7]

Numerous motions and briefs have been filed by counsel for the respective parties, as set out more fully in memorandum opinions of September 30, 1971, and January 12, 1972. All motions were denied in orders entered September 30, 1971 and January 10, 1972.

In the memorandum opinion of September 30, 1971 it was held that (1) this court has jurisdiction; (2) the United States is not an indispensable party defendant; (3) the United States should not be joined as an involuntary party plaintiff; and (4) this is a proper class action. In the January 12, 1972 opinion it was held further that (5) the notice served upon the defendants was sufficient; (6) no further notice or questionnaire was required; and (7) all defendants, both members and nonmembers of the Northern Cheyenne Tribe who would be affected by the judgment in this case, are adequately represented by counsel.[8]

a right of appeal, and that if the court determines that the allottees, their heirs and devisees have a vested interest in the minerals protected by the fifth amendment, or if the Tribe does not commence an action within two years, the provisions of section 3 of the Act of June 3, 1926, as amended, shall "be carried out as fully as if section 3 had not been amended by this Act."

2. While the complaint does not specifically allege that it is brought pursuant to Rule 23, it does contain allegations clearly designed to bring it within that rule.

3. The Tribe is a federal corporation chartered under the Act of June 18, 1934 (48 Stat. 984), as amended by the Act of June 15, 1935 (49 Stat. 378).

4. By amended complaint filed September 8, 1970 two additional persons were named as defendants, both individually and as representatives of heirs and devisees who are nonmembers of the Northern Cheyenne Tribe.

5. It is alleged, *inter alia*, that the allottees, their heirs and devisees number 1,489 persons located in various places throughout the United States and are so numerous as to make it impracticable to bring them all before the court; that there are questions of law or fact which are common to the entire class; and that the named defendants will fairly and adequately protect the interests of the class.

6. The ten reside in various parts of the Northern Cheyenne Reservation. Two were named from each of the five political districts for electoral purposes.

7. Williamson is an enrolled member of the Eastern Shawnee Indian Tribe. The other named defendant who is not a member of the plaintiff Tribe, Delores Walters Murdock, is a member of the Crow Tribe. Bowen is an non-Indian who inherited from an allottee.

8. It was recognized that in a class action the interests of the representative parties must be typical of those of the entire class; the action must be vigorously prosecuted by the representative parties and their counsel; counsel must be competent to conduct the litigation; and it is necessary to eliminate as far as possible the likelihood that the litigants are involved in a collusive suit or that the representative parties have interests antagonistic to those of the remainder of the class or subclass. See Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–563 (2 Cir. 1968).

The court adheres to all of these conclusions.[9]

In a pretrial order entered July 10, 1972 the parties agreed to submit the following legal issues for determination prior to trial:[10]

"1. Whether or not the defendants and their predecessors in interest received a vested property right in the minerals in and under their respective allotments which is protected by the Fifth Amendment of the United States Constitution by virtue of the Act of June 3, 1926 (44 Stat. 690) as amended;

"2. Whether or not the defendant class is entitled to the revenues received by the plaintiff by virtue of the execution of leases and permits covering the minerals in and under their respective allotments;[11]

"3. Whether or not the plaintiff is liable to the defendants for damages done to the surface of their respective allotments by the permittees and lessees of the plaintiff in exploring for mineral deposits in and under said allotments;[12]

"4. Whether or not the defendants are entitled to an injunction to enjoin the plaintiff and its permittees and lessees from going upon their respective allotments for the purpose of exploring for mineral deposits."

### Acquisition of Reservation Lands

The lands comprising the Northern Cheyenne Reservation were originally part of Crow country recognized by the Treaty of September 17, 1851, 11 Stat. 749. 2 Kappler, Indian Affairs, Laws and Treaties, 594. When the Crow Reservation was created by the Treaty of May 7, 1868, 15 Stat. 649, the "Crow Nation ceded all its right and title in other lands embraced within the treaty area to the United States." United States v. Northern Pacific Ry. Co., 311 U.S. 317, 354, 61 S.Ct. 264, 281, 85 L.Ed. 210 (1940). The United States thereupon became the owner of these lands.

The Northern Cheyenne Reservation was created by an executive order issued by President Arthur on November 26, 1884 which directed that the land be "withheld from sale and settlement, and set apart for the use and occupation of the Northern Cheyenne Indians, * * * and such other Indians as the Secretary of the Interior may see fit to locate thereon * * *." 1 Kappler, supra, 860. The boundaries of the reservation were enlarged by an executive order of President McKinley on March 19, 1900, the tract of land therein described being "withdrawn from sale and settlement and set apart as a reservation for the permanent use and occupation of the Indians now occupying or belonging upon the Northern Cheyenne Reservation, * * *." 1 Kappler, supra, 860.[13]

9. All of these questions were discussed fully in the opinions of September 30, 1971 and January 12, 1972.

10. It was stipulated that this submission was made without waiver by the defendants of any of the defenses asserted in pretrial motions or waiver by plaintiff of its right to contest the jurisdiction of the court over the counterclaims of the defendants.

11. The parties have stipulated that the plaintiff in the past has entered into oil and gas leases, coal permits and coal leases and has received sums of money therefor, the exact amount of which is not presently available to the parties.

12. The parties have stipulated further that the plaintiff's lessees and permittees have explored for mineral deposits and in the exploratory operations have disturbed the surface of the ground and have removed certain samples of the soil and mineral deposits; that there has been no production of oil and gas or coal from the lands.

13. I find no merit in defendants' contention that the Northern Cheyenne Indians acquired a vested interest in these lands under the Northern Cheyenne and Northern Arapaho Treaty of May 10, 1868, 15 Stat. 655. While the Northern Cheyenne Indians agreed to accept land to be set apart as a permanent reservation and

*Act of June 3, 1926*

The executive order of March 19, 1900 was confirmed by Congress June 3, 1926 in the enactment of the Northern Cheyenne Allotment Act (44 Stat. 690). Section 1 declares the lands "to be the property of [the Northern Cheyenne] Indians, subject to such control and management of said property as the Congress of the United States may direct." Section 2 provides for the allotment of agricultural and grazing lands not exceeding 160 acres to each of the duly enrolled Indians "now living, for whom said reservation was set apart. * * * ."

Section 3 provides that the timber, coal or other minerals "are hereby reserved for the benefit of the tribe and may be leased with the consent of the Indian council under such rules and regulations as the Secretary of the Interior may prescribe." This is followed by two provisions critical to a determination of this case: (1) that at the expiration of fifty years the coal or other minerals "shall become the property of the respective allottees or their heirs," and

(2) that the unallotted lands "shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians."

### Congressional Policies Re: Indian Lands

The question of whether under these provisions of the Act of June 3, 1926, as amended,[14] the allottees, their heirs or devisees, "have received a vested property right protected by the fifth amendment" must be considered in the light of well established national policies with respect to Indians and Indian property.

#### a. Plenary Power of Congress

First, it is clear that Congress has plenary power to deal with Indian affairs and property.[15] It is true, as defendants contend, that the "power to control and manage" is not absolute. The United States, may not, for example, give tribal lands to others or appropriate them for its own purposes without just compensation.[16] Here, however,

---

relinquished their rights to all other lands, the reservation lands now occupied by the Northern Cheyenne Tribe were not described in that treaty and the members of the Tribe acquired no vested interest under that treaty in either the surface or minerals.

14. Act of June 3, 1926 (44 Stat. 690), as amended by the Act of July 24, 1947 (61 Stat. 418), and the Act of September 22, 1961 (75 Stat. 586). Under the 1957 amendment timber was "hereby declared to be the property of the allottees." The 1961 amendment provided that upon the expiration of the fifty year period the minerals "shall become the property of the respective allottees or their heirs or devisees, subject to any outstanding leases, regardless of any prior conveyance by such allottee, heirs, or devisees of the land overlying such minerals, oil, gas, or other natural deposits * * *." The Amendment provided further that title to the minerals was to be "held by the United States in trust for the Indian owners, except that if upon the expiration of said fifty years the entire Indian interests in the minerals within any allotment or parcel thereof is granted by this Act to a person or persons who at

that time hold an unrestricted title to the lands overlying such minerals, oil, gas, or other natural deposits, then the Secretary of the Interior shall by fee patent transfer to such person or persons the unrestricted fee simple title to such minerals, oil, gas, or other natural deposits, which title shall vest in such person or persons as of the date of the patent."

15. U.S.Const., Art. I, § 8, cl. 3; Worcester v. State of Georgia, 31 U.S. 515, 561 (6 Pet. 515), 8 L.Ed. 483 (1832); United States v. Kagama, 118 U.S. 375, 385, 6 S.Ct. 1109, 30 L.Ed. 228 (1885); Perrin v. United States, 232 U.S. 478, 486, 34 S.Ct. 387, 58 L.Ed. 691 (1914); Department of Interior, Federal Indian Law, 21, 38 (Cohen 1958 Rev.).

16. United States v. Alcea Band of Tillamooks, 329 U.S. 40, 54, 67 S.Ct. 167, 91 L.Ed. 29 (1946), citing Stephens v. Cherokee Nation, 174 U.S. 445, 478, 19 S.Ct. 722, 43 L.Ed. 1041 (1899); and United States v. Creek Nation, 295 U.S. 103, 110, 55 S.Ct. 681, 79 L.Ed. 1331 (1935). See also United States v. Shoshone Tribe, 304 U.S. 111, 115, 58 S.Ct. 794, 82 L.Ed. 1213 (1938).

we are not concerned with the taking of Indian property for others, but with a controversy between the Tribe and members and nonmembers of the Tribe who own allotted lands. This controversy must be resolved by determining the intent of Congress in the Act of June 3, 1926 and the power of Congress in the Act of July 14, 1968.[17]

In dealing with "tribal property subject to the control of the United States as guardian of Indians, Congress may make such changes in the management and disposition as it deems necessary to promote their welfare."[18] In determining "what is reasonably essential to the protection of the Indians, Congress is invested with a wide discretion, and its action, unless purely arbitrary, must be accepted . . . by the courts."[19]

### b. Reservation of Mineral Estates

Second, it had been the policy of Congress for several years prior to the enactment of the Northern Cheyenne Allotment Act in 1926 to sever mineral estates from surface estates on many Indian reservations, the severed, but undivided and unallotted, mineral estates being held in trust for the tribe for a term of years. This policy was usually expressed, as here, by the Allotment Acts "reserving" the minerals for the benefit of the tribe for a term of years and a provision that at the expiration of the term the minerals would "become the property" of the allottees of the lands.[20] In some cases Congress subsequently acted to extend the term the mineral estate was to be held in trust for the tribe.[21]

The power of Congress to extend a period of reservation of mineral rights was recognized in Adams v. Osage Tribe of Indians, 59 F.2d 653, 657 (10 Cir. 1932) cert. denied 287 U.S. 652, 53 S.Ct. 116, 77 L.Ed. 563, the case upon which plaintiff places primary reliance. There the Court held that statutes enacted in 1921 and 1929[22] extending a twenty-five year period of reservation of mineral rights in the Osage Tribe under the Act of June 28, 1906 (34 Stat. 539) were within the power of Congress and not violative of due process. It recognized that the reservation was sufficient to divide allotments into two estates, surface and mineral, and held that the allottees did not take vested estates in remainder in the minerals on issuance of deeds to their allotment of the surface. The Court concluded: "And so we say the reservation in the Allotment Act and the

17. As stated in the Memorandum Opinion of September 30, 1971, at 10: "Here, the United States has a duty to hold and protect the mineral rights in question. The sole issue is whether it is to hold them for the plaintiff tribe or the defendant allottees, their heirs and devisees. If the defendants lose what they claim they are entitled to under the Northern Cheyenne Allotment Act it will be because Congress has so directed. If they prevail, it will be because that direction was beyond Congress's constitutional power to impose."

18. Morrison v. Work, 266 U.S. 481, 485, 45 S.Ct. 149, 151, 69 L.Ed. 394 (1925). See also Gritts v. Fisher, 224 U.S. 640, 642, 32 S.Ct. 580, 56 L.Ed. 928 (1912); Department of Interior, Federal Indian Law, *supra* at 34.

19. Perrin v. United States, *supra*, note 15 at 486, 34 S.Ct. at 390. See also United States v. Thomas, 151 U.S. 577, 585, 14 S.Ct. 426, 38 L.Ed. 276 (1894).

20. For example, Act of June 28, 1906, § 3 (34 Stat. 539) (Osage Indian Reservation, 25 year reservation); Act of June 30, 1919, § 10 (41 Stat. 3, 17) (Blackfeet Indian Reservation, "until Congress shall otherwise direct" reservation); Act of June 4, 1920, § 6 (41 Stat. 751) (Crow Indian Reservation, 50 year reservation); Act of March 3, 1921, §§ 4 and 6 (41 Stat. 1355) (Fort Belknap Reservation, 50 year reservation). See generally, Department of Interior, Federal Indian Law, *supra*, at 649–652.

21. For example, Act of June 28, 1906 (34 Stat. 539), as amended by the Act of March 3, 1921 (41 Stat. 1249), and the Act of March 2, 1929 (45 Stat. 1478) (Osage Indians).

22. Act of March 3, 1921 (41 Stat. 1249) and Act of March 2, 1929 (45 Stat. 1478).

Acts of March 3, 1921, and March 2, 1929, were 'but an exertion of the administrative control of the government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect and while the tribal relations continued.'" 59 F.2d at 657, quoting Gritts v. Fisher, *supra,* note 18, 224 U.S. at 648, 32 S.Ct. 580, 583.[23]

### Contentions of the Parties

Recognizing the wide discretion of Congress in exercising its plenary power over Indian lands and the general policy of reserving minerals, the defendants contend that Adams v. Osage Tribe of Indians, *supra,* is distinguishable and that the Act of June 3, 1926, unlike other and comparable acts, contains no express reservation of power in Congress to modify, extend or extinguish the interest of the surface allottees in the mineral estate. They argue that Congress manifested a clear intent in the 1926 Act to vest title to the minerals, and was powerless to change or modify that vested interest in 1968.

On the other hand, plaintiff argues that while the Act of June 3, 1926 does not contain the precise language of the Osage and other reservations, it does contain a comparable, and perhaps wider, reserved power in Congress.

### Is Adams v. Osage Tribe of Indians Distinguishable?

The Osage Allotment Act of June 28, 1906, Section 2, Paragraph 7, (34 Stat. 539), *inter alia,* granted allotments in surface land and provided:

"That the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said lands at the expiration of said twenty-five years, unless otherwise provided for by Act of Congress."

Further, the Act provided at Section 3:

"That the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage Tribe for a period of twenty-five years * * * ."

And at Section 5:

"That at the expiration of the period of twenty-five years * * * the lands, mineral interests, and moneys, herein provided for and held in trust by the United States shall be the absolute property of the individual members of the Osage Tribe * * * or their heirs, as herein provided * * * ."

The Northern Cheyenne Allotment Act of June 3, 1926 does not include the phrase "unless otherwise provided by Congress" following the reservation of the mineral estate to the Tribe. Section 1 of the Act does provide, however, that the Northern Cheyenne Reservation "is hereby, declared to be the property of said (Northern Cheyenne) Indians, subject to such control and management of said property as the Congress of the United States may direct." [24] Since the reserved mineral estate is a part of the reservation land, it is also subject to this reserved power of Congress to manage and control, negating a congression-

23. See also Taylor v. Tayrien, 51 F.2d 884, 887 (10 Cir. 1931) cert. denied 284 U.S. 672, 52 S.Ct. 127, 76 L.Ed. 569, where the court held that the Osage Act of 1906 "made no allotment of the mineral estate in the land; it remained tribal property." The court said further at 890: "The idea in reserving the minerals to the tribe was doubtless a double one; it tended to equalize the allotments to the individuals, and it preserved intact a source to which the Indian who had squandered his allotment, might look for sustenance.

In 1906 it was thought that the Osages would be ready for complete emancipation by 1931; as that year drew near, it was seen that he was not yet ready to hold his own; the period has been twice extended for his protection."

24. This express and broad reservation of power over all reservation land in the first section of the Northern Cheyenne Allotment Act is absent in the other Allotment Acts cited *supra.*

al intent to vest mineral rights in individual allottees.

Section 3 of the June 3, 1926 Act provides for the leasing of minerals during the fifty year trust period, that the minerals shall become the property of the individual allottees upon the expiration of the fifty year trust period, and that "the unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians." A mineral estate "is in itself land, and, being reserved for the benefit of the tribe, it is tribal land, and is unallotted." British-American Oil Producing Co. v. Board of Equalization of State of Montana, 299 U.S. 159, 164–165, 57 S.Ct. 132, 134, 81 L.Ed. 95 (1936).[25] Thus, Congress's reserved power to manage and control unallotted land precluded any vesting of rights in the allottees, and preserved the power to extend in perpetuity the trust period of the mineral estate.

I conclude that by reason of the general provision in Section 1 of the Act of June 3, 1926 that the property of the Northern Cheyenne Reservation is "subject to such control and management" as Congress may direct, reinforced by a similar provision in Section 3, Adams v. Osage Tribe of Indians, supra, is indistinguishable and should be followed here.

### No Vested Mineral Interest Granted to Surface Allottees

In addition to the reserved power in Congress, the language of the Act of June 3, 1926 also indicates that no present mineral interest was granted to the surface allottees. The Act provides

that the minerals shall "become" the property of the allottees "at the expiration of fifty years."

In contrast, when Congress acted in Section 1 to convey a present interest to the Tribe it provided that the Northern Cheyenne Reservation "is hereby, declared to be the property" of the Northern Cheyenne Indians. And again, by amendment in the Act of July 24, 1947, (61 Stat. 418) Congress provided that timber on surface allotments is "hereby declared to be the property of the allottees * * *."

The court in finding no vested mineral rights in the Osage allottees characterized their interest as an "inchoate right" to receive a share of the net returns, "subject to the will of Congress." Taylor v. Tayrien, supra, at 887. See also Adams v. Osage Tribe of Indians, supra. Cohen describes an individual's right in tribal property as a "prospective right"[26] and defines it as "an intangible right to share" in tribal property. Department of Interior, Federal Indian Law, supra, at 748.

■ I conclude that, consistent with Congressional policy and comparable allotment acts reserving minerals to a tribe, the Northern Cheyenne Allotment Act of June 3, 1926 also reserves sufficient power in the Congress to reserve the Northern Cheyenne mineral estate "in perpetuity for the benefit of the tribe",[27] and that the allottees, their heirs and devisees, received no "vested property right in the minerals which is protected by the fifth amendment." The reserved mineral estate is unallotted tribal land subject to the control and management of Congress under Sections 1 and 3 of the Northern Cheyenne Allot-

---

25. See also United States v. Bruisedhead, 248 F.Supp. 999, 1001 (D.Mont.1966).

26. Defendants argue that the interest of the allottees, their heirs and devisees, is "equivalent to a future interest, presently vesting." Plaintiff terms the interest a "mere expectancy." Because of the unique guardian/ward relationship between the United States and Indians, and the trust character of tribal property, use of stand-

ard property descriptions—mere expectancy, future interest, remainders, conditions precedent and subsequent—are of little assistance.

27. It is unnecessary to determine the exact nature or character of the Tribe's interest in the reserved mineral estate. See Department of Interior, Federal Indian Law, supra, at 583.

ment Act of June 3, 1926 (44 Stat. 690), as amended.[28]

This conclusion in effect disposes of the remaining issues of law submitted for determination prior to trial. No useful purpose would be served by a detailed discussion of these issues.[29]

■ Clearly, if the defendants acquired no vested interest in the minerals under the Act of June 3, 1926, as amended, they acquired no right to the revenues received by the plaintiff by virtue of the execution of leases and permits covering the minerals under their respective surface allotments. Even if they had acquired a vested interest in the minerals, under the clear provisions of the 1926 Act, as amended, they would not be entitled to the proceeds from any lease or sale prior to the expiration of the fifty year period.

■ Section 4 of the Act of June 3, 1926 expressly provides that "all the income of said tribe from rents, royalties, or other profits accruing from the sale of any * * * coal, or other minerals, including oil, gas, and other natural deposits herein reserved for the benefit of the said Indians, * * * shall be deposited in the Treasury of the United States to the credit of the Northern Cheyenne Indians and be subject to expenditure for their benefit in such manner as Congress may direct." The plain meaning of this language establishes an intent on the part of Congress that all proceeds from the lease or sale of mineral rights inure to the collective benefit of the Northern Cheyenne Indians during the fifty year period.[30]

■ Defendants also seek damages and an injunction prohibiting exploration, drilling and development of the minerals on surface allotments. The owners of a mineral estate or its lessee can enter and use the surface for exploration, recovery and development of the minerals, as is reasonably necessary. Hurley v. N. P. Ry. Co., 153 Mont. 199, 202, 455 P.2d 321 (1969). Defendant is entitled to neither damages nor an injunction for the activities of the Tribe and its lessees in exploring, drilling, and developing their mineral estate.[31]

28. This conclusion is strengthened by the language in the patents issued to individual allottees. All trust patents issued pursuant to both the original Act of June 3, 1926 and the subsequent amendments, allotting lands as homesteads "subject to all the provisions, conditions, limitations, and restrictions contained in (the) Act of June 3, 1926", contain this express reservation: "There is also reserved, for the benefit of the Northern Cheyenne Indians, all the coal or other minerals, including oil, gas and all natural deposits in said land." At least part of the fee patents contain this reservation: "There is reserved for the benefit of the Northern Cheyenne Indians, all the coal or other minerals, including oil, gas and all natural deposits in said land, in accordance with the provisions of the Act of June 3, 1926 (44 Stat. 690)."

Clearly the trust patents provide no basis for any allottee's reliance on a present vested interest or even the promise of a future interest in the minerals. While the statute rather than the form of patent is controlling, the patent does manifest an interpretation of the statute by the Department of the Interior consistent with the conclusions herein stated.

29. They were fully considered in the memorandum opinion of September 30, 1971 in denying motions for a temporary restraining order and preliminary injunction.

30. At the date of the enactment of the Allotment Act the Northern Cheyenne Tribe was not a legal entity distinct from its members. As noted *supra*, note 3, subsequently the Tribe was incorporated under the Act of June 18, 1934 (48 Stat. 984), as amended by the Act of June 15, 1935 (49 Stat. 378). Some persons who were not members of the Tribe became entitled to allotted lands through descent and distribution. The revised language contained in the 1961 amendment to section 3 reflects these changes.

31. Any disturbance of the surface has resulted from exploratory operations. There has been no production from any of the lands. See note 12, *supra*. In its brief filed July 14, 1972 plaintiff recognizes the right of the surface estate, saying in part: "While it is quite clear that the plaintiff, its permittees and licensees, are entitled to go upon for the purpose of exploration, the plaintiff does

Counsel for all parties have submitted comprehensive and well prepared briefs, which have been very helpful to the court.

Pursuant to Rule 14(b) of the local rules of court, plaintiff will prepare and file a draft of judgment in accordance with this opinion and serve a copy upon each other party.

### On Motions for New Trial or to Amend Judgment

Counsel for all of the named defendants have filed motions for a new trial or to amend the judgment. Prior to entry of its order of September 29, 1972, the court considered all of the statutes, treaties, executive orders, and cases cited in support of the motions and ruled against defendants' contentions.

Nothing has been presented to persuade the court to modify its conclusions. On the contrary, the court finds support in the per curiam opinion of the United States Supreme Court in United States v. Jim, and Utah v. Jim, —— U.S. ——, 93 S.Ct. 261, 34 L.Ed.2d 282, decided November 20, 1972. The Court held that a 1933 statute (47 Stat. 1418) conferring oil and gas royalties on Indians residing on the Aneth extension of the Navajo Reservation "did not create constitutionally protected property rights" in the beneficiaries of the Act and upheld a 1968 Act (82 Stat. 121) enlarging the class of beneficiaries to include the entire Navajo tribe residing in San Juan County, Utah.

Defendants Williamson and Bowen, noting the similarity between the 1933 statutory grant to the residents of the Aneth extension and the 1926 Act upon which the defendants here rely, urged this court to follow the opinion of the Utah District Court (unreported) holding that the 1933 Act vested property rights in the Aneth extension residents

not assert that its permittees and licensees have a right to go on and strip mine, which would in essence destroy the surface estate of the defendants. The

and that the 1968 Act was unconstitutional.

The Supreme Court reversed. Following Gritts v. Fisher, 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912), the Court concluded:

"Congress has not deprived the Navajo of the benefits of mineral deposits on their tribal lands. It has merely chosen to re-allocate the * * * royalties * * * in a more efficient and equitable manner. This was well within the power of Congress to do. As no 'property,' in a Fifth Amendment sense, was conferred upon residents of the Aneth extension by the 1933 Act, no violation of the Fifth Amendment was effected by the 1968 legislation."

The motions for a new trial or to amend the judgment are denied.

plaintiff recognizes that its licensees or permittees have no right to destroy the surface estate without compensating the individual defendants."