The **NORTHERN CHEYENNE TRIBE**, Plaintiff-Appellee,

v.

**NORTHERN CHEYENNE DEFENDANT CLASS OF ALLOTTEES, HEIRS AND DEVISEES, Defendant-Appellant.**

The **NORTHERN CHEYENNE TRIBE**, Plaintiff-Appellee,

v.

**Elva L. Littlechief WILLIAMSON and James Bowen, Defendants-Appellants.**

The **NORTHERN CHEYENNE TRIBE**, Plaintiff-Appellee,

v.

**Myron L. LITTLEBIRD, Defendant-Appellant.**

Nos. 73–1545 to 73–1547.

United States Court of Appeals, Ninth Circuit.

Oct. 17, 1974.

Lewis E. Brueggemann (argued). Billings, Mont., for appellants in 73–1545.

Robert W. Holmstrom (argued), of Longan & Holmstrom, Billings, Mont., for appellees in all three cases.

Steven L. Bunch, of Montana Legal Services Association, Helena, Mont. (argued), for appellants in 73–1546.

Otis L. Packwood, U. S. Atty. (argued), Billings, Mont., for appellants in 73–1547.

Before WRIGHT and CHOY, Circuit Judges, and PALMIERI,* District Judge.

CHOY, Circuit Judge:

The Northern Cheyenne Tribe, at the direction of Congress, brought this action in the district court under a special grant of jurisdiction against appellants, individual owners, and class representatives of all allottees, their heirs and devisees, owning allotments of land within the tribal reservation. At stake are the rights to the mineral deposits contained in and beneath these lands. In 1968, Congress reserved these deposits in perpetuity for the benefit of the tribe, provided the tribe instituted this suit "to determine whether under the provisions of the Act of June 3, 1926 [44 Stat. 690], as amended, the allottees, their heirs or devisees, have received a vested property right in the minerals which is protected by the fifth amendment." Act of July 24, 1968, 82 Stat. 424, 425. The district court held that no vested property rights were received and awarded judgment for the tribe, 349 F.Supp. 1302 (D.Mont. 1972). This appeal followed. We reverse.

*The Act of June 3, 1926 as Amended*

Pursuant to its then existing policy under the General Allotment Act of 1887, 24 Stat. 388, of ending the Indians' communal land holdings and substituting therefore the private ownership of the reservation lands, Congress in 1926 ordered the allotment of specific tracts of land in the Northern Cheyenne reservation in Montana. In the first section of the Northern Cheyenne Allotment Act (the Act), Congress declared the reservation lands to be the property of Northern Cheyenne Indians, "subject to such control and management of said property as the Congress of the United States may direct." 44 Stat. at 690. Section 2 authorized the Secretary of the Interior to prepare a complete roll of these Indians along with a list of lands suitable for agriculture and grazing. A tract not exceeding 160 acres of such land was then to be allotted in severalty to each of the duly enrolled Indians for whom the reservation was set apart, and a trust patent issued for this land. Classified as a homestead of the individual allottee, the land was to be held in trust for him by the United States, and was to remain inalienable and nontaxable for a period of twenty-five years from the issuance of the patent, or until the death of the allottee.

---

* The Honorable Edmund L. Palmieri, Sr. United States District Judge for the Southern District of New York, sitting by designation.

In the part of the Act which is most critical here, Congress reserved the land's timber and mineral deposits for the benefit of the tribe for a period of years. Section 3 states:

"That the timber, coal or other minerals, including oil, gas, and other natural deposits, on said reservation are hereby reserved for the benefit of the tribe and may be leased with the consent of the Indian council under such rules and regulations as the Secretary of the Interior may prescribe: *Provided,* That at the expiration of fifty years from the date of the approval of this Act the coal or other minerals, including oil, gas, and other natural deposits, of said allotments shall become the property of the respective allottees or their heirs: *Provided further,* That the unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians." 44 Stat. at 691.

After several other changes in the Act,[1] on July 24, 1968, Congress enacted P.L. 90–424, 82 Stat. 424, which amended Section 3 of the Act to read as follows:

"(a) The coal or other minerals, including oil, gas, and other natural deposits, on said reservation are hereby reserved in perpetuity for the benefit of the tribe and may be leased with the consent of the Indian council for mining purposes . . . under such rules, regulations, and conditions as the Secretary of the Interior may prescribe.

(b) The unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians."

Thus, as a result of the 1968 amendment, the mineral deposits which under the Act were to become the allottees' property in 1976, were instead declared to be the property of the tribe in perpetuity. The question presented is whether the allottees received rights to the minerals through the Act which are constitutionally protected against impairment by the 1968 amendment. The answer to this question in turn depends upon the intent of Congress in 1926 when it reserved the minerals for fifty years, but provided that thereafter they would become the property of the allottees.

The district court held that Congress had reserved to itself sufficient powers (1) to preclude any vesting of rights in the allottees and (2) to preserve its right to extend in perpetuity the trust period of the mineral estate. The court reasoned that the allottees received no rights in the minerals when Congress reserved them for the tribe; that this reservation severed them from the allotted lands, creating two separate estates, one surface and one mineral, with only the surface estate passing to the allottees, while the minerals became part of the unallotted tribal lands. Since Congress, in section 3 of the Act, had

---

1. Under the Act of July 24, 1947, the timber on the allotted land was declared to be the property of the allottees. 61 Stat. 418. In 1961, Act of September 22, 1961, 75 Stat. 586, the Act was amended so that at the expiration of the fifty year period the minerals "shall become the property of the respective allottees or their heirs or devisees, subject to any outstanding leases, regardless of any prior conveyance by such allottee, heirs, or devisees of the land overlying such minerals, oil, gas, or other natural deposits . . ." Further, title to the minerals was to be "held by the United States in trust for the Indian owners, except that if upon the expiration of said fifty years the entire Indian interests in the minerals within any allotment or parcel thereof is granted by this Act to a person or persons who at that time hold an unrestricted title to the lands overlying such minerals, oil, gas, or other natural deposits, then the Secretary of the Interior shall by fee patent transfer to such person or persons the unrestricted fee simple title to such minerals, oil, gas, or other natural deposits, which title shall vest in such person or persons as of the date of the patent."

explicitly reserved the power to manage and control such unallotted land, the court concluded that the reallocation of the minerals to the tribe was but a valid exercise of this power. In addition, the court found that Congress's more broadly stated power in section 1, of management and control over the reservation lands, indicated that it intended to retain its plenary authority over the mineral rights. Finally, the court concluded that the language in section 3, referring to the minerals which "shall become the property of the individual allottees," when compared with other language stating that the land "is hereby, declared to be the property" of the allottees, showed that Congress created only an inchoate or prospective right to the minerals, rather than a present vested one. 349 F.Supp. at 1308–1309.

We believe the district court erred when it considered the mineral deposits as unallotted tribal land subject to reappropriation, when Congress, by its unconditional, noncontingent grant of these deposits to the allottees, evidenced an intent to create rights to the minerals in their favor. Under the Fifth Amendment, these rights, belonging to the individual allottees incident to their ownership of the allotted lands, could not be divested absent compliance with due process of law or payment of compensation.

### Reserving Mineral Deposits

It had been Congress's policy in several other allotment statutes, where the lands contained potentially valuable mineral resources, to allot the surface estate while reserving for the tribe for a period of years the minerals beneath these lands. *E. g.,* Act of March 3, 1921, 41 Stat. 1355 (Fort Belnap Indians); Act of June 4, 1920, 41 Stat. 751 (Crow Indians); Act of June 28, 1906, 34 Stat. 539 (Osage Indians). In each of these prior acts, however, the future interest of the allottees at the expiration of the term fixed was clearly made contingent upon Congress not acting to the contrary.[2] Thus, where Congress had retained the power to extend the period of the Osage Indians' tribal ownership, it has been held that the allottees could not prevent this extension based on a claim that they had received vested rights to those minerals. Adams v. Osage Tribe of Indians, 59 F.2d 653 (10th Cir. 1932); *see* Taylor v. Tayrien, 51 F.2d 884 (10th Cir. 1931).

The 1926 Act on the other hand contains no language qualifying or conditioning the allottees' remainder interest in the mineral deposits. The rather conspicuous omission of such language from a statute dealing with the same subject as the previous legislation, indicates that Congress intended to create rights in the Northern Cheyenne allottees different from those in the other allotment statutes.

Although we reach the opposite result here from that in *Adams, supra,* the rationales for both cases are entirely consistent. In construing the language of the Osage Allotment Act, 34 Stat. 539, as amended, the court in *Adams* followed the

"established rule that treaties and legislative acts that deal with Indians and their affairs are to be taken in accord with common understanding, not in their technical sense, but in the sense that an illiterate people would understand them."

---

2. The mineral deposits in the allotted lands of the Fort Belnap Indians were reserved for the tribe for fifty years, thereafter to become the property of the individual allottee or his heir, "but the right [was] reserved to Congress to extend the period within which such reserved tribal rights shall expire." 41 Stat. at 1359. The reservation for the Crow Indian tribe similarly provided that "unless otherwise ordered by Congress" these mineral deposits "shall become the property of the

individual allottee or his heirs . . . ." 41 Stat. at 753. And, in the case of the Osage Indians, the future mineral rights were awarded to the allottees "unless otherwise provided for by Act of Congress." 34 Stat. at 542; see also Act of June 30, 1919, 41 Stat. 3, 17, where the mineral deposits were "reserved for the benefit of the Blackfeet Tribe of Indians until Congress shall otherwise direct. . . . "

59 F.2d at 654. The court found that language "simple and plain, and its meaning clear to common understanding." *Id.* at 655. The provision granting the minerals "unless otherwise provided for by Act of Congress" clearly reserves in Congress the power to alter, extend or otherwise modify the allottees' interest.

■ There is no such clear expression of Congress's retained power in this case. While it is technically correct that the reservation to the tribe severs the minerals from the allotted lands, making them part of the unallotted tribal property,[3] and thereby confers upon Congress the power to change the beneficiaries of such tribal lands,[4] the ultimate result of such analysis would be Congress's achieving through the back door what it had never specifically claimed when it went through the front. Viewing the reservation for the tribe not in this technical sense but in the way the Indians would understand it, the minerals were never declared to be a part of the unallotted lands. In the plain words of the statute, the minerals were simply reserved, or set aside, for the benefit of the tribe for a fixed term of fifty years, thereafter to become the property of the allottees, with no conditions attached to their receipt of these minerals. It is this meaning of the statute that creates a right to the minerals in favor of the allottees. Under *Adams* it should be controlling. Where either of two interpretations of the language used by Congress is possible, one having a technical mean-

ing and the other as naturally understood by the Indians, the natural meaning of the words must prevail, since statutes passed for the benefit of the Indians are to be liberally construed and all doubts are to be resolved in their favor.[5] Squire v. Capoeman, 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956); Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912); Stevens v. C. I. R., 452 F.2d 741, 744 (9th Cir. 1971); Arenas v. Preston, 181 F.2d 62, 66 (9th Cir. 1950).

### The Allottees' Rights in Allotted—Versus Unallotted—Lands

The power reserved by Congress in section 1 of the 1926 Act, over the reservation lands, cannot be the basis for any extinguishment of the allottees' rights in their allotted lands. "Reservation land is divided into two classes: land allotted to individual Indians for the use and benefit of the allottee; and common tribal land used for the benefit of the entire community. . . ." C. I. R. v. Walker, 326 F.2d 261, 262 (9th Cir. 1964). There is a broad distinction between such tribal property held in common and the private property held by the individual allottee. Choate v. Trapp, *supra* 224 U.S. at 671, 32 S.Ct. 565. *See* United States v. Oklahoma Gas & Electric Co., 127 F.2d 349, 353–354 (10th Cir. 1942).

---

3. British-American Oil Producing Co. v. Board of Equalization, 299 U.S. 159, 164–165, 57 S.Ct. 132, 81 L.Ed. 95 (1936). In this case, the Court held that Congress may consent to state taxation levied on the production of oil under tribal lands. The statute involved was that reserving the mineral deposits on the Blackfeet Indian reservation (see note 2 *supra*), Act of June 30, 1919, 41 Stat. 3, 16, 17, for the tribe "until Congress shall otherwise direct." Thus, the case concerned only tribal rights in the mineral deposits. To the extent that the Court determined that a mineral reservation severs this estate and makes it unallotted land, we believe that the facts here, which pertain to individual property rights, are distinguishable and we therefore are not bound by this language.

4. *See* United States v. Jim, 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972).

5. Nominally the dispute in this case is between the tribe on one side and the class of allottees, heirs and devisees on the other. But the actual controversy involves not these parties, but appellants, some of whom are Indians, claiming rights in the minerals beneath their lands, and Congress which by the 1968 Act seeks to extinguish these claimed rights. As the district court stated: "If the [appellants] lose what they claim they are entitled to under the Northern Cheyenne Allotment Act it will be because Congress has so directed. If they prevail, it will be because that direction was beyond Congress's congressional power to impose." 349 F.Supp. at 1307 n. 17.

It is undoubted that as regards tribal property Congress maintains plenary authority to make such changes in the management and disposition thereof as it deems necessary in order to promote the welfare of the Indians. Morrison v. Work, 266 U.S. 481, 485, 45 S. Ct. 149, 69 L.Ed. 394 (1925); Gritts v. Fisher, 224 U.S. 640, 648, 32 S.Ct. 580, 56 L.Ed. 928 (1912); see United States v. Jim, 409 U.S. 80, 93 S.Ct. 261, 34 L. Ed.2d 282 (1972). And, so long as the land remains tribal in character the individual Indian has no vested right, as against the tribe, to any specific part of the tribal property. Gritts v. Fisher, *supra*; St. Marie v. United States, 108 F.2d 876 (9th Cir. 1940). *See generally,* F. Cohen, Handbook of Federal Indian Law 183 (1940).

Once the reservation land is allotted in severalty and a trust patent issued, however, though legal title is retained by the United States, the allottee acquires an equitable interest in the property, which except for the restriction on alienation, gives him the virtual fee in the land. United States v. Paine Lumber Co., 206 U.S. 467, 473, 27 S.Ct. 697, 51 L.Ed. 1139 (1907); Arenas v. Preston, *supra,* 181 F.2d at 64; United States v. Minnesota, 113 F.2d 770, 773 (8th Cir. 1940); Eastman v. United States, 28 F.Supp. 807, 808 (W.D.Wash. 1939). The Supreme Court considered the nature of the allottees' interest in Choate v. Trapp, *supra,* where Congress had allotted lands to the Choctaw and Chickasaw Indians. The lands were declared to be non-taxable for a period of twenty-five years. Some ten years later, Congress enacted further legislation which permitted state taxation of these unrestricted lands. The Court held

"[T]he provision that the land should be non-taxable was a property right, which Congress undoubtedly had the power to grant. That right fully vested in the Indians and was binding upon Oklahoma. . . .

". . . Under the provisions of the 5th Amendment there was no more power to deprive [the allottee] of the exemption than of any other right in the property. No statute would have been valid which reduced his fee to a life estate, or attempted to take from him 10 acres, or 50 acres, or the timber growing on the land.

After he accepted the patent the Indian could not be heard, either at law or in equity, to assert any claim to the common property. If he is bound, so is the tribe and the government when the patent was issued." 224 U.S. at 673–674, 32 S.Ct. at 569.

Similarly, here, the Northern Cheyenne Indians received a vested right to the minerals incident to their allotments. Congress was without power subsequently to divest them of that right. That Congress realized it may have exceeded even its own plenary power to deal with tribal property (United States v. Jim, et al., *supra*) in enacting the amendment of July 28, 1968, here in issue (p. 269, *supra*) is evidenced by the unusual nature of the enactment itself. The 1968 amendment to the 1926 Allotment Act, attempting to reserve the mineral deposits to the tribe in perpetuity, is wholly provisional, and explicitly leaves the validity of the enactment entirely up to the court.[6]

The judgment permitting such divestiture is reversed and remanded to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

6. The statute reads in pertinent part: If the court determines that the allottees, their heirs or devisees, have received a vested interest in the minerals which is protected by the fifth amendment, or if the tribe does not commence an action as here authorized within two years from the date of this Act, the first section of this Act shall cease to have any force or effect, and the provisions of section 3 of the Act of June 3, 1926, as amended by the Acts of July 24, 1947, and September 22, 1961, shall thereupon be carried out as fully as if section 3 had not been amended by this Act. Act of July 24, 1968, 82 Stat. 424, 425.